**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|   |   |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | )     **Criminal No. 11-cr-10228-DJC** |
| | ) |
| ERIC FRANCO, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

_____)

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                                                       July 10, 2012

## I.        Introduction

Defendant Eric Franco ("Franco") has been charged in a one-count indictment with being a felon in possession of a firearm and ammunition.  D. 1.[1]  This charge arises out of the events of May 3, 2011 when members of the Lynn Police Department reported to Franco's residence at 386A Walnut Street, Lynn, MA in response to a 911 call from Franco's girlfriend at the time, Sabina Lyden ("Lyden"), who reported that Franco had assaulted her.

Franco has now moved to suppress the items, including the firearm and ammunition,  seized that day on several grounds.  First, Franco argues that the firearm and ammunition were discovered during an improper, warrantless search of the apartment in which the police coerced Lyden's consent

---

[1]References to the docket are indicated by "D. __."   References to the exhibits admitted during the suppression hearing are indicated by "Exh. __."  References to the exhibits to Franco's motion to suppress are indicated by "Exh. __ to Def. Mot."  References to the transcripts of the suppression hearing that extended over five days, and were attached to Franco's Summation on the Motion to Suppress, D. 48, as Exhs. 1-4,  are indicated by "Tr. [day]:[page]."

and/or used her as their agent to find the firearm.  Second, Franco argues that the subsequent search of 386A Walnut Street pursuant to a search warrant was also improper since it was based on the initial, impermissible search and therefore, there was no probable cause for the issuance of the search warrant.  D. 26 at 1.[2]

The Court held an evidentiary hearing, at Franco's request (D. 26 at 23) that spanned several days (May 10-11 and May 29-30, 2012) and concluded with arguments from counsel on June 21, 2012.  At the hearing, the government called Officers James Randazza and Andrew Beaver of the Lynn Police Department.  Franco called his former girlfriend, Lyden, and Lyden's friend, Andria Pizzi ("Pizzi").  The government also called Officer Gregory McCarthy as a rebuttal witness.  On June 21, after hearing the attorneys' summations, the Court took this matter under advisement.

## II.     Standard of Review and Burden of Proof

### A.     <u>Standing</u>

As an initial matter, "[b]efore a court can address the merits of a motion to suppress . . . the defendant must first establish that his own Fourth Amendment rights were violated by showing that he had a reasonable expectation of privacy in the place searched."  <u>United States v. Bucci</u>, 582 F.3d 108, 116 (1st Cir. 2009); <u>see</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 138-39 (1978).  The defendant bears the burden of proving that he had a reasonable expectation of privacy in the area searched or the items seized.  <u>See</u> <u>United States v. Lewis</u>, 40 F.3d 1325, 1333 (1st Cir. 1998).  "To establish such an expectation of privacy, [the defendant] must show that 1) he 'has exhibited an actual, subjective

---

[2]Franco had also moved to suppress certain statements that he made on August 31, 2011. D. 26 at 1.  Since the government has informed the Court that it does not intend to offer these statements in its case-in-chief, D. 29 at 1 n. 1, this portion of the defendant's motion to suppress is denied as moot.

expectation of privacy' in the area searched; and 2) 'such subjective expectation is one that society is prepared to recognize as objectively reasonable.'" Bucci, 582 F.3d at 116 (citation omitted); United States v. Cruz Jimenez, 894 F.2d 1, 5 (1st Cir. 1990).

### B.     Warrantless Searches by Consent

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. Amend. IV. "A warrantless search is unreasonable unless one of the recognized exceptions to the warrant requirement applies." United States v. D'Andrea, 648 F.3d 1, 6 (1st Cir. 2011). However, the Fourth Amendment applies only to searches and seizures that are the product of state action. United States v. Doe, 61 F.3d 107, 109 (1st Cir. 1996) (concluding that "[r]outine security searches at airport checkpoints" do not offend the Fourth Amendment); see, e.g., D'Andrea, 648 F.3d at 6 (noting that "[b]ecause the Tipster was a private actor, her unauthorized viewing of the website did not implicate the Fourth Amendment"). The burden is on the government to prove that one of the exceptions to the warrant requirement applies. United States v. Irizarry, 673 F.2d 554, 557 (1st Cir. 1982) (citation omitted).

### 1. Consent

It is well settled that "'one of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)); United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). The burden is on the government to show, by a preponderance of evidence, that consent was given freely and voluntarily. Perez-Montanez, 202 F.3d at 438 (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). "Voluntariness [of consent] turns on a

number of factors, including the [consenting] person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'" United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) (quoting United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)).  The Court must take into account the "totality of circumstances" and "can also consider 'whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.'" Coraine, 198 F.3d at 309 (quoting Barnett, 989 F.2d at 555).  Moreover, "'[a] consensual search may not exceed the scope of the consent given.'" Melendez, 301 F.3d at 32 (quoting United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999)).  Proving that a consensual search fell within the scope of consent also falls to the government.  Turner, 169 F.3d at 87 n. 3.

### 2.        Probable Cause for Search Warrant

Where a search is conducted pursuant to a search warrant, there is "'a presumption of validity with respect to the affidavit supporting the search warrant.'"  United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).  Where a defendant challenges the legality of a search conducted pursuant to a search warrant, the defendant bears the burden of showing by a preponderance of the evidence that the search was unlawful. United States. v. Legault, 323 F. Supp. 2d 217, 220 (D. Mass. 2004); see United States v. Burdulis, No. 10-40003, 2011 WL 1898941, at *3 (D. Mass. May 19, 2011) (citing cases).  A "warrant application must demonstrate probable cause to believe that (1) a crime has been committed . . . and (2) enumerated evidence of the offense will be found at the place to be searched. . . ." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation omitted).  The issue for the reviewing court is whether "the totality of the circumstances" in the affidavit afforded the clerk magistrate a

"substantial basis for determining the existence of probable cause" for the search. Illinois v. Gates, 462 U.S. 213, 238 (1983). A reviewing court "must examine the affidavit in a practical, commonsense fashion" and "accord considerable deference to a magistrate's determination that information in a particular affidavit establishes probable cause." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (internal quotation marks and citation omitted).

## III. Findings of Fact

### A. The 911 Call from Lyden

On May 3, 2011, Lyden informed Franco, her boyfriend at the time and with whom she had been living for two and half years at 386A Walnut Street in Lynn, Massachusetts, Tr. 3:5, by text message that she was leaving him. Tr. 3:45. After receiving this news, Franco came home and he was enraged. Tr. 3:46. He began to throw Lyden's belongings and the belongings of her four-year-old daughter out onto the driveway and street. Tr. 3:46. Franco also began to assault Lyden by grabbing her by the throat, hitting her in the face, dragging her by the hair and pinning her against a kitchen cabinet. Tr. 3:46-47, 3:129. His abuse that day left red marks on Lyden's face and chest. Tr. 3:47. Franco also threatened to kill Lyden. Tr. 3:47, 50; 4:56. Although he had abused her in the past, Franco's assault on May 3rd was different because on this occasion, he went looking for Lyden's young daughter, "kind of went to grab her," and Lyden thought that Franco was going to hit her child. Tr. 3:48-49.

At some point during this altercation, Lyden called her friend, Pizzi, to come over to help her move out of the apartment because she was leaving Franco. Tr. 3:114-15. After Pizzi arrived, Lyden made a 911 call from Pizzi's car to report that Franco had hit her, attempted to hit her daughter and was throwing her things out of the apartment. Tr. 3:53, 140; Exh. 6 at Track 1. In the

course of this call, Lyden noted that Franco was a member of the Hell's Angels, that he was their Sergeant-at-Arms and that he was "known to hit police officers so [dispatch] should send more than one person." Tr. 3:53-54, 141; Exh. 6 at Track 1. Lyden mentioned Franco's affiliation with the Hell's Angels so that the police would "understand the severity of the situation. . . . [t]ypically Hell's Angels, when they say they're going to do something, they do it. So by him [Franco] saying that he was going to kill me if I called the police or saying that I couldn't leave, he was serious." Tr. 3:53-54. Even while Lyden was waiting in Pizzi's car outside, Franco was throwing Lyden's and her daughter's belongings, including a flat-screen television, out of the apartment onto the dirt road. Tr. 3:132, 153; Exh. 6. Franco subsequently came up to the open window of Pizzi's car and grabbed Lyden's face pretty hard and continued to yell at her. Tr. 3:55-56, 134-35. Soon thereafter, Franco went back into the apartment, got their dog and walked across the street. Tr. 3:56, 87, 136-37. Lyden remained at the scene because she wanted to gather her and her daughter's belongings before leaving. Tr. 3:57. Accordingly, Lyden went back into the apartment to do so and Pizzi remained in her car with Lyden's daughter. Tr. 3:58.

In response to Lyden's 911 call about Franco's assault, the Lynn Police Department dispatched uniformed officers in a marked cruiser to 386A Walnut Street. Tr. 2:73-75. The initial dispatch that was broadcasted to the officers indicated that it was "a domestic [call]," the Walnut Street address, Franco's name and the fact that the "party [Franco]'s inside tearing up the house." Exh. 6 at Track 2; Tr. 2:76; 2:108. Officers James Randazza and Andrew Beaver were the first officers to arrive at the Franco/Lyden residence shortly after the dispatch. Tr. 1:7-8; 2:75, 108; 3:88. Although Officer Beaver had not had any personal contact with Franco prior to this date and Officer Randazza had only encountered him when he assisted in his booking for a prior arrest, they knew

him to be a member of the Hell's Angels. Tr. 1:26-27, 52; 2:76, 108. The officers understood that the Hell's Angels are involved in illegal activity involving guns and drugs. Tr. 1:28, 69-70, 82; 2:26, 115-16.[3]

**B. Randazza and Beaver Arrive at 386A Walnut Street in Response to the 911 Call**

When the officers arrived, they observed Pizzi outside of the residence. 1:8-9. Pizzi was near her car and had Lyden's daughter in the backseat. Tr. 1:9; 2:81-82. Pizzi indicated that Lyden, the person who had made the 911 call, was still inside by pointing to a staircase into the residence. Tr. 1:9-10, 80; 2:30, 78-79, 110; 3:88, 147. Before going into the residence, the officers observed household items, clothing, baby items and a large, flat screen television strewn around the ground and driveway area. Tr. 1:10; 2:82. At the top of the stairs, the officers saw that the door was open and could see that another female, later determined to be Lyden, was standing there. Tr. 1:13-14; 2:80, 110; 3:67; Exh. 1. Officer Randazza ascended the stairs to speak with Lyden.[4]

In the meantime, Officer Beaver continued to speak with Pizzi. Tr. 3:88. Pizzi was concerned about speaking with the officer because Franco was a member of the Hell's Angels. Tr.

---

[3]Defense counsel made much of the fact that Officer Randazza could not recall hearing Franco's name on the dispatch en route to 386A Walnut Street. Tr. 2:16-19, 25-27. Regardless of his recollection, the Court finds, based on the other evidence in the record including the turret tape (of which Officer Randazza acknowledged he had no reason to doubt the accuracy, Tr. 2:61), that Officer Randazza knew that Franco was the alleged suspect and had an affiliation with the Hell's Angels at least by the time that he spoke to Lyden at 386A Walnut Street.

[4]There was some dispute about whether Officer Beaver immediately followed Officer Randazza up the stairs or joined him sometime later. Compare Tr. 1:15 with 2:84-86. Officer Randazza was not sure where Officer Beaver went, but thought that Officer Beaver was right behind him as he went up the stairs or "assumed he was there." Tr. 1:15, 74, 81; 2:33-34. Officer Randazza also could not remember specifically when Officer Beaver came into the residence. Tr. 1:47. Officer Beaver testified that he stayed downstairs for a brief time to speak with Pizzi. Tr. 2:113. Any inconsistency on this issue is immaterial as there is no dispute that Officer Randazza was the first officer in the apartment and the first to speak with Lyden. Tr. 1:17.

2:82-83; 3:85-86, 149-50.  She did inform Officer Beaver that Lyden had called her over to help her move out of the apartment.  Tr. 2:83.  Pizzi said that she observed Franco throwing items out of the apartment when she arrived.  Id.  After that, Lyden had come out and gotten into Pizzi's vehicle with her daughter.  Id.  Pizzi then observed Franco approach the vehicle, reach in and grab by the neck/throat or jaw area.  Tr. 2:84.  When Franco let go of Lyden, he left the area.[5]  Tr. 2:84. Beaver spoke with Pizzi for a few minutes before Randazza called him into the residence.  Tr. 2:86; Tr. 3:89.

Officer Randazza testified that Lyden invited him inside and he did not force his way inside. Tr. 1:16, 77-78, 81; 2:33; 3:66-67.  He observed that she had red marks on her face, neck and upper chest and that she was upset and crying.  Tr. 1:16, 18, 81; 2:102.  The officer asked Lyden if she needed medical attention.  Tr. 1:19-20; 3:14, 68.  Lyden responded that she did not and that she "just wanted to get the fuck out of here."  Tr. 1:20; 3:13, 69.  She explained that Franco had grabbed her and slapped her in the face.  Tr. 1:23, 82-83; 2:33.  She explained that she was fed up with the abuse and was leaving to stay at her mother's home.  Tr. 1:24.

### C.    Franco's Bag Containing the Firearm and Ammunition

As they were having this conversation, Lyden was gathering and packing her and her daughter's belongings from different areas of the residence including the master bedroom that she shared with Franco and her daughter's bedroom.  Tr. 1:20, 24-25, 46; 3:68-69.  As with the outside of the apartment, the inside of the apartment was also in disarray with "items everywhere, clothes everywhere, boxes everywhere."  Tr. 1:21-22, 79; 2:95-96; 3:133.  In the course of her packing, Officer  Randazza, while standing outside of the entrance to the master bedroom, saw Lyden go to

---

[5]By the time Officers Randazza and Beaver arrived on the scene, other officers were in pursuit of Franco on foot in the area.  Exh. 6.

the base or foot of the bed, bend down and pick up a blue duffel bag. Tr. 1:32-34; 2:47; Exh. 3. Carrying the bag, already opened, Lyden walked toward Officer Randazza. Tr. 1:35-36. As she was walking toward the officer, she said that "she was going to put some of her personal belongings in it, but she can't because Eric [Franco] has his gun in there, among other things." Tr. 1:35; 2:47. She identified the duffel bag as Franco's. Tr 1:46. Officer Randazza told Lyden to put the bag down on the couch in the living room. Tr. 1:37; Exh. 4. As she moved to put the open bag on the couch, she stopped and showed it to Officer Randazza. Tr. 1:40. Officer Randazza observed that it contained a firearm, a clear plastic bag with ammunition, a white trash bag and another clear plastic bag that appeared to contain marijuana. Id. When Lyden put it on the couch, she took a box from the bag that had a picture of a scale on it. Tr. 1:41; 2:91-92. The officer told her to put that item down as well and she placed it right next to the duffel bag on the couch. Tr. 1:41; Exh. 5.

Although Officer Randazza believed that Beaver was there when she retrieved the bag, Tr. 2:41, the Court credits Officer Beaver's testimony that Officer Beaver joined Officer Randazza inside when he summonsed him inside when Lyden referenced the firearm in the duffel bag. Tr. 2:86. Officer Randazza told Officer Beaver that Lyden came across the firearm when she was trying to pack some things in a bag, but Officer Beaver himself also observed Lyden holding the unzipped duffel bag and watched her remove the box and put the bag and the box on the couch. Tr. 2:89-92, 94, 114. Officer Beaver also saw the partial grip of the handgun and what appeared to be a bag of marijuana in the duffel bag. Tr. 2:93. Neither officer opened or touched the bag. Tr. 1:35; 2:93. Lyden also informed the officer that Franco had steroids in a safe inside their bedroom. Tr. 1:45. Officer Randazza radioed to the other officers that a firearm had been recovered at the residence. Tr. 1:44; 2:94; Exh. 6 at Track 13. Other officers in pursuit of Franco on foot then apprehended him behind 84 Glen Avenue in Lynn. Exh. 6 at Track 14-15. In response to Officer Randazza's

transmission, approximately ten other officers joined Officers Randazza and Beaver at the residence. Tr. 1:48.

### D. The Police Obtain a Search Warrant for 386A Walnut Street

Based upon Lyden's retrieval of the duffel bag, the officers decided to get a search warrant for the residence. Randazza was not involved in securing the scene, obtaining the search warrant or in executing the search warrant as he was directed to return to the station and write his police report. Tr. 1:50; 2:53-54. Officer Beaver and other officers remained on the scene to secure it while the search warrant was being obtained and then participated in the execution of the search warrant. Tr. 2:103.

The Lynn District Court issued a search warrant for, among other things, controlled substances, including marijuana and steroids, and any and all illegally kept firearms and ammunition. Exh. R to Def. Mot., D. 26. Pursuant to the search warrant, the officers who remained on scene conducted a search of the residence. In the course of the search, the police recovered, among other things, the duffel bag– containing the firearm (a 9mm Ruger semi-automatic firearm), digital scale, suspected marijuana, a loaded Ruger magazine with eleven live rounds of ammunition and two sandwich bags of live rounds–and a sandwich bag of oxycontin pills, sandwich bag of suspected cocaine and a safe containing steroids and needles and syringes. Exh. R to Def. Mot. Franco who had been previously apprehended, was charged in state court with domestic assault and battery, malicious destruction of property over $250, threat to commit a crime and drug and firearm charges.

### E. The Aftermath of May 3, 2011

#### 1. *Lyden Details History of Domestic Abuse*

The next day, May 4, 2011, Lynn Police Detective Chadbourne interviewed Lyden by phone.

Exh. 10; Tr. 3:30-32. Lyden detailed prior incidents of abuse by Franco that she had not reported to the police, but noted that the May 3, 2011 incident was the first time that an assault had occurred in front of her daughter. Exh. 10. She also reported that another Hell's Angels member lived on Walnut Street and that, on May 3rd, a number of Hell's Angel members appeared outside 386A Walnut Street and were taking photos of Lyden, her car and her friend (Pizzi). Exh. 10.

### 2.      An Article in <u>The Daily Item</u> Details Lyden's Assistance to Police

On May 5, 2011, an article appeared in *The Daily Item*, the local newspaper, detailing Franco's arrest and the charges against him. Although it did not identify Lyden by name, the article recounted that the allegations of abuse made by "Franco's live-in girlfriend" and that "[a]s she began to pack a bag to leave the apartment, she pointed out a handgun allegedly belonging to Franco, along with a scale, ammunition and a bag of marijuana." Exh. 11; Tr. 4:69. Lyden later testified that when she read the newspaper account of her assistance to the police, she felt "betrayed." Tr. 3:36. She was upset about the article because, in her own words, "[b]ecause it illicitly pointed to the fact that, A, I got the bag; and, B, the search warrant was implicated after I got the bag." Tr. 4:69. The following day, May 6, 2011, Lyden left a voicemail message for Detective Chadbourne. Exh. 12. Lyden was very upset about the article and asked rhetorically whether the police were "trying to get [her] killed" given the information in the news article about her assistance to the police. Id.; Tr. 4:71. She later testified that she was "completely enraged" because she felt "at that point I had been used, and that the offer of trying to make me not look like a rat and not get me killed was just, for a lack of a better word, bullshit." Tr. 3:36. She was worried that everyone, including members of the Hell's Angels, were going to read that article and "were going to come after [her]." Tr. 4:70, 72.

### 3.      Lyden Obtains a Restraining Order Against Franco

On May 6, 2011, Lyden applied for a restraining order against Franco in the Ayer District

Court. Tr. 4:59. In her application for the restraining order, she described how, among other things, Franco had threatened her life, would not let her pack and said he was going to kill her when she said that she was going to call the police. Tr. 4:62-63; Exh. 14. Her application also noted Franco's affiliation with the Hell's Angels and that she was also in fear of retaliation from his comrades. Tr. 4:64-65; Exh. 14. She later claimed that she sought the restraining order because she was also fearful of Franco's friends, including but not limited to his fellow members of the Hell's Angels, particularly in light of the May 5th newspaper article "that detailed the fact that [she] was a rat when [she] was told that [she] was going to be made not to look like one." Tr. 4:61. The court granted the restraining order. Tr. 4:61; Exh. 15.

### 4. Lyden Declines to Testify at Franco's Trial for Assault

Franco was tried in November 2011 in Lynn District Court for the assault charges arising out of his abuse of Lyden on May 3, 2011. Gov't Opp. at 13 n. 12. Lyden did not appear to testify against him despite receiving a summons to do so. Tr. 4:90. In the absence of her testimony, Franco was acquitted of the charges. Tr. 4:90; Gov't Opp. at 13 n. 12.

### 5. Franco is Indicted by a Federal Grand Jury on Firearm and Ammunition Charges

On June 15, 2011, a federal grand jury charged Franco with being a felon in possession of a firearm and ammunition, the charges at issue in this case. D. 1. Both Officer Randazza and Lyden testified before the grand jury on June 1, 2011. Exhs. F and G to Def. Mot.

### 6. As of April 2012, Lyden Claims that Her Previous Statements and Testimony were Part of a "Cover Story"

On April 19, 2012, Franco filed his motion to suppress the seizure of his duffel bag and its contents, relying in part upon affidavits signed by Lyden and Pizzi on April 11, 2012. D. 26, Exhs. A and B.

Before the grand jury on June 1, 2011, Lyden testified that she had gotten Franco's duffel bag from their bedroom, that she had unzipped it and that Officer Randazza had not instructed or told her to retrieve it. Exh. G to Def. Mot. at 32. When she saw what was in it–namely, a firearm, scale and some marijuana–she thought she should probably tell the officer about it. Id. She then told Officer Randazza and told him that she could not use that bag to pack because Franco had his gun in it. Id. at 33-34.

However, unlike her grand jury testimony, her previous statements to police on the day of incident, or even in her May 6, 2011 recorded voicemail message to Detective Chadbourne expressing displeasure at the newspaper account of her assistance to police, in her April 11, 2012 affidavit and her testimony at the subsequent suppression hearing in May 2012, Lyden, for the first time, now claimed that Officer Randazza had pressured and threatened her and she had produced the duffel bag in her residence to him as a result of these coercive tactics. Exh. A to Def. Mot. at ¶¶ 4-17, 21, 27; Tr. 3:18-23; 4:42, 49, 53.[6] Lyden claims that the police accounting (and her previous grand jury testimony) that she had brought the duffel bag to the police's attention in the midst of packing

---

[6]The Court notes that the government raised a concern that Lyden's testimony might implicate her Fifth Amendment right against self-incrimination. When the government first raised this issue, it was articulated as a concern that Lyden, one of the defendant's expected witnesses, would perjure herself if she took the stand and testified consistently with her April 2012 affidavit, but inconsistently with her June 2011 grand jury testimony. D. 36 at 10-13. The government requested, over Franco's objection, that the Court appoint counsel for Lyden. Id. The Court declined to do so at that junction since the government's argument did not implicate the Fifth Amendment regarding any past criminal conduct, but rather, the risk that any witness encounters if she takes the witness stand and testifies untruthfully. Id. at 17. However, during Lyden's testimony when she was asked if she had knowingly and intentionally lied under oath before the grand jury, Tr. 3:76, this line of questioning by the government about allegedly giving past false testimony did implicate her Fifth Amendment right. Tr. 3:77-81. Accordingly, the Court suspended her testimony and appointed counsel for Lyden. 3:100-105. After consultation with appointed counsel who advised her of her Fifth Amendment rights and the risks of her continued testimony, Lyden indicated that she was prepared to continue to testify, Tr. 3:156; 4:39-41, and did so.

was a "cover story" that Officer Randazza concocted "so [she didn't] look like a rat, which I had explained to him could get me killed in my life, and that was the story that he thought would be believable." Tr. 3:26; Exh. A to Def. Mot. at ¶ 21(f). Pizzi's affidavit and testimony at the hearing echoed this claim. Exh. B to Def. Mot. at ¶¶ 6-20; Tr. 3:94-96, 98. Pizzi, Lyden's best friend since sixth grade (Tr. 3:84), claimed that she was present for Lyden's exchange with the police and that "[s]he finally broke down and retrieved the duffel bag from the bedroom and . . . was telling the officer before she retrieved the duffel bag that she wanted to like–she didn't want to be a rat and things like that." Tr. 3:94, 4:7.[7] Although Lyden did not deny going into their bedroom, getting Franco's duffel bag, unzipping it and walking it from the bedroom into the living room (Tr. 3:74; 4:45-46, 70), she denies telling police that she could not use it to pack because it had Franco's firearm in it, Tr. 3:74-75, 4:58-59, and claimed that "they [the police] forced me into handing stuff [gun and drugs] over." Tr. 4:56-57. Lyden claimed that she did retrieve the bag "on [her] own," but only because she was "under the impression that if [she] did not, [she] would be penalized for it." Tr. 4:46. Pizzi testified that the officers told Lyden that they were going to get a search warrant and that Lyden should "do the right thing" and retrieve anything illegal in the residence so she did not get in trouble, that she could potentially lose her daughter and that she had her daughter to think about. Tr. 3:92. As to her prior testimony under oath before the grand jury in June 2011 in which Lyden testified that she had produced the duffel bag voluntarily when she went to go use it to pack,

---

[7]There is a serious question as to whether Pizzi was present when the duffel bag was brought out. Even by Lyden's accounting, Pizzi was in and out of the apartment at the time and she did not know whether Pizzi was present at this moment. Tr. 4:47-48. Moreover, neither Officer Randazza nor Officer Beaver remember Pizzi being present at this time. Randazza's focus was on Lyden while in apartment, but he did not recall Pizzi inside the apartment, Tr. 1:37, 48; 2:41. Officer Beaver also did not recall Pizzi or Lyden's daughter in the apartment during the time that he was there. Tr. 2:99.

she now claimed that this was part of the "story that [she] was fed to say." Tr. 4:43-45, 58-59, 110.

## IV.    Discussion

### A.    The Scope of Lyden's Consent

Franco concedes, as he must, that Lyden gave initial consent for the police to enter 386A Walnut Street. D. 26 at 17.[8] The Court disagrees with his further argument that the police exceeded the scope of that consent. Id. It is undisputed that Lyden was all over the apartment on May 3rd gathering belongings to pack while officers were there. Lyden had shared the residence with Franco and had lived there for two and half years, sharing a bedroom with him. She had both actual and apparent authority to be there and consent to any search of the premises. See United States v. Marshall, 348 F.3d 281, 284-85 (1st Cir. 2003). There is no legal distinction, as Franco suggests, between Franco's side of the bedroom and hers.

Franco argues that the officers exceeded the scope of Lyden's consent to enter when they remained after she indicated to Officer Randazza that she did not need medical attention and just wanted "to get the fuck out of here." Franco suggests that the officers remained because they knew that they were in the residence of a member of the Hell's Angels and wanted to ferret out evidence of illegal conduct by staying to conduct an illegal search including coercing Lyden into assisting

---

[8]As an initial matter, the Court rejects the government's argument that Franco did not have standing to assert a violation of his Fourth Amendment rights. Gov't Opp. at 15. The government's argument is that the affidavit submitted by Franco in support of the motion to suppress is "woefully inadequate" in establishing Franco's reasonable expectation of privacy in the duffel bag and its contents. Gov't. Opp. at 17; Exh. C to Def. Mot. However, it was undisputed from the police reports or the prior grand jury testimony of Lyden and the officers that Lyden had identified that bag containing the contraband as Franco's. Exh. G to Def. Mot. at 31. Upon this record in this case, the Court concludes that the Defendant has satisfied his burden of showing that he had a reasonable expectation of privacy in the bag and its contents.

them.  Tr. 1:62-63.  As an initial matter, there was nothing untoward and inherently coercive about the officers remaining at the scene after Lyden initially refused medical attention.  The officers had been summonsed to the scene by Lyden's 911 call of domestic abuse, they observed the red marks on Lyden's person that were consistent with that report, the outside and inside of the apartment were in disarray and Lyden was still visibly upset.  Although the police dispatch indicated that Franco had fled the residence (Tr. 2:28), his whereabouts were unknown as other officers were in the process of pursuing Franco while Officers Randazza initially encountered Lyden.  Tr. 1:84-85.  Officer Randazza testified that he remained to make further inquiry of the victim, Lyden, given that she had been physically assaulted and was reporting a crime.  Tr. 1:71-72, 84, 86.  Under the totality of circumstances, the Court does not think that the fact that Officer Randazza and Beaver remained at the scene lends any support to the Defendants' argument that they did so with improper motives.

Based upon the totality of the circumstances, the Court concludes that the government has proven, by a preponderance of evidence, that Lyden's consent was freely and voluntarily given.  See United States v. Andrade, 925 F. Supp. 71, 82 (D. Mass. 1996).  There was nothing that the officers did during their time in her apartment that exceeded the scope of such consent.

### B.  Discovery of Franco's Duffel Bag Was Not the Result of a Search

There was, however, no search, consensual or otherwise, of the apartment before the police obtained the search warrant.  Although it is true that "a search carried out by a private party in conjunction with government efforts may no longer qualify as a private search immune from the Fourth Amendment," D'Andrea, 648 F.3d at 10, the credible evidence does not support Franco's argument that such was the case here.  The Court finds that Franco's duffel bag containing the contraband was not discovered as the result of any search by the police, or any coercive tactics by the police, but as a result of Lyden's voluntary actions.  To the extent, Lyden gave eleventh hour

16

testimony that she was coerced or threatened into producing the duffel bag (or that Pizzi's testimony echoed this claim), the Court does not credit that testimony. Neither the credible testimony or the totality of the circumstances suggest that Lyden was coerced into producing the bag.

At no time on May 3, 2011 did Lyden, a twenty-five year old with some high school education, appear fearful of the officers. Tr. 2:102. No officer ever yelled or raised their voice at Lyden. Tr. 4:138. At no time, did the officers say or do anything to Lyden to indicate that she could not leave. Tr. 1:20, 50-51. Lyden never said anything to indicate that she thought she could not leave the apartment or that she could be arrested. Tr. 1:50, 53.[9] As Officer McCarthy testified, who arrived on the scene while Officers Randazza and Beaver were still there, the officers did nothing to restrict her movement around the apartment. Tr. 4:134-35. Even Pizzi testified that Lyden was free to move about the apartment and that she herself was in and out of the apartment. Tr. 4:23.[10] Lyden never tried to leave the apartment because, as was consistent with her own testimony, she had re-entered the apartment after Franco had walked up the street to retrieve her and her daughter's belongings; this was the same reason that she did not leave the apartment because she was not going to do so until she had retrieved those belongings. Tr. 3:69. [11] Significantly, there is nothing about

---

[9]I credit the testimony that Lyden was never told that she could not leave nor was it suggested that she could not leave. To the extent that Lyden's testimony suggests otherwise, see Tr. 3:16, the Court does not credit it.

[10]It is actually not clear if Pizzi was in the apartment for a continuous period of time since she had left Lyden's four-year-old daughter out in her car. Tr. 3:146, 152-53.

[11]The officers did not interfere with Lyden's continued packing when they first encountered her in the apartment and after Lyden brought the firearm to their attention. Tr. 2:95. The officers noted, however, that they kept their eyes on her as she did so to ensure that she did not grab or do anything that would pose a safety concern. Tr. 1:29; 2:63, 116. Officer Beaver could not recall any officer searching her bags as she removed them (Tr. 2:116-17), but it would not be material if other officers did, as Lyden and Pizzi alleged (Tr. 3:70, 94) since such actions were not the subject of Franco's motion and are not inconsistent with securing the scene while

Lyden's demeanor on the witness stand at the suppression hearing, her tone of voice in the voicemail message to Detective Chadbourne when she was irate about *The Daily Item* article or even the courage it took for her to call 911 on May 3rd to suggest that Lyden's will is easily overborne.

As Officer Randazza testified at the suppression hearing (and as Lyden previously testified before the grand jury), the Court finds that Lyden brought Franco's duffel bag containing the contraband to the police's attention when she was in the midst of packing to leave Franco. Officer Randazza denied directing Lyden to go to a specific area of the apartment, denied threatening her or coercing her into finding any evidence, guns, drugs or anything else. Tr. 1:36, 51. Neither Officer Beaver nor Officer McCarthy reported any threats against Lyden.[12] The Court credits that testimony and notes that the untoward motives and actions that Lyden assigns to the police is inconsistent not only with the credible evidence in this case, but with what happened after Lyden produced the duffel bag. The police did not then conduct a warrantless search of the residence nor did they seek Lyden's consent to conduct a wholesale search of the residence. Instead, they had her place the bag on the couch and wait until they obtained a search warrant to conduct a search.[13]

That Lyden previously gave testimony before the grand jury that was consistent with Officer

---

awaiting the arrival of a search warrant.

[12]To the extent that Lyden feared that she could lose custody of her daughter if she did not cooperate, Exh. A at ¶ 4(a) to Def. Mot.; 4:85, there was no credible evidence of such threats of same by police. As Officer McCarthy explained (Tr. 4:137), and as Lyden conceded at least in part at the hearing (Tr. 4:85, 110), the contact with DCF was prompted by Franco's actions toward the child and any continued relationship Lyden might have with him, not any action or inaction by Lyden.

[13]To the extent that Franco suggests that a search began before the search warrant arrived, see Tr. 3:20 (Lyden described Officer Randazza "thumbing through" Franco's jewelry), such argument is not supported by credible evidence. Officer Beaver, who remained on the scene after Officer Randazza returned to the station to write his report, testified that the residence was not searched prior to the warrant getting there and the Court credits this testimony. Tr. 2:104.

Randazza's and Officer Beaver's testimony at the suppression hearing, undercuts her claim that there was a "cover story," particularly where she gave her prior grand jury testimony after having been advised of her right to consult counsel and that she did not need to testify that day if she did not wish to do so (Tr. 4:83-84). Although Officer Randazza testified before the grand jury the same day as Lyden, she had only a brief encounter with the officer then in the presence of the federal case agent and prosecutor. Tr. 2:43-44. Officer Randazza testified that he never threatened or coerced Lyden there either. Tr. 1:54-55; 2:51. Lyden said she felt threatened by Randazza in this context, but conceded that she never raised this issue with the prosecutor or federal agent who were also present. Tr. 4:86, 105-06. Moreover, Randazza was not present during her grand jury testimony. Even if she was emotional during her grand jury testimony, Tr. 4:114, 116,[14] this does not support her claim that she was testifying pursuant to a police-concocted cover story since all of the events of May 3, 2011, particularly the events that precipitated her 911 call, made have led her to be emotional.

### 1.  The Cover Story

In her April 11, 2012 affidavit and her testimony at the suppression hearing, Lyden claimed that she was coerced into providing Franco's duffel bag to police on May 3rd and that her prior statements, including her June 2011 grand testimony, that she had voluntarily and without police prompting and direction, given the bag to the officers was part of a "cover story" concocted by

---

[14]Franco's counsel subpoenaed Apex Reporting for the recording of the grand jury testimony of Officer Randazza and Lyden. (The transcripts of these proceedings had already been provided to counsel by the government), D. 36 at 17-27, but the government moved to quash the subpoena. As to Lyden, Franco's counsel argued that although the government had already produced the transcript, the recording itself would capture her demeanor which, he claimed, would be relevant to the argument that she had been coerced. The Court denied this "unusual" request, D. 36 at 24, given its concerns about the integrity of the grand jury proceedings and the defendant's failure to make a particularized showing of his need for this recording. D. 36 at 27; D. 37 at 4-6.

Officer Randazza. According to Lyden, the purpose of the cover story was to protect her from retribution from Franco and his comrades for assisting the police. The Court does not find this claim credible for a number of reasons.

First, between May 3 and June 1, 2011, Lyden had contact with several people in connection with this case and did not mention the existence of a cover story: not in her May 4th recorded call with Detective Chadbourne; not in her recorded voicemail message to the same detective when she was irate about *The Daily Item* article; not before her June 1st grand jury appearance when she encountered not only Officer Randazza, but another federal agent and an Assistant United States Attorney; and not in the course of her grand jury testimony. Second, Officer Randazza denies concocting the "cover story" that Lyden claims. Tr. 2:49. Third, it is unclear why this officer would go to the trouble of concocting a "cover story" allegedly in an attempt to protect Lyden from retribution for her assistance to the police when the cover story itself–i.e., that Lyden came across Franco's bag containing the contraband and readily handed it over to the police–points the finger at Lyden for assisting the police on her own initiative. Franco's counsel does not think that the merits of the cover story should play any role in the Court's analysis. The Court disagrees; whether the "cover story" is capable of doing what Lyden alleges it was intended to do (i.e., protect her) is relevant to whether the Court finds that her claim is credible. The Court finds that it is not a credible claim.

Lyden's non-coerced motivation for producing the duffel bag is of no matter, but it is certainly fair to conclude from the record that she was understandably upset at Franco and his physical acts of violence against her on May 3, 2011. So upset, that she broke part of the code of Franco's world of not interacting with the police. Tr. 3:8-10. But after the May 5th publication of the *The Daily Item* article, Lyden was also upset at the police. That she now claims that her actions

on May 3rd were at the behest and coercion of the police is in the Court's view, an attempt to do what she believes the police did not do, namely protect her from the risk of retribution. Whatever Lyden claimed about not fearing Franco and Hell's Angels at the time of the suppression hearing, Tr. 4:111, there is much in the record to suggest that this is not true. In fact, she had reason to fear retribution even before *The Daily Item* article was published. Even as she was removing items from her apartment on May 3, 2011 after the police arrived, members of the Hell's Angels were taking photographs of what was happening. Tr. 4:98. Even then, Lyden was concerned about why they were doing so. Tr. 4:98-99. She also chose not to testify against Franco in his assault trial despite the physical abuse that she chronicled in her restraining order application and the suppression hearing. For all of these reasons, the Court does not credit Lyden's testimony (or that of Pizzi to the extent that her testimony echoed Lyden's)[15] that her production of the duffel bag was merely a "cover story."

Accordingly, the Court concludes that there was no police search (or search conducted by Lyden at the behest, direction or coercion of police) and that Lyden's production of the bag to the police was a voluntary action not involving state action or police coercion.[16]

## C. There was Probable Cause for the Search Warrant Issued for 386A Walnut Street

---

[15]Pizzi's testimony was not of great aid to the Court. The Court credits the testimony of Officer Beaver, who interviewed her on the day of the incident, that was initially "a little reticent" when he interviewed her because Franco was a member of the Hell's Angels. Tr. 2:82-83. The Court observed that this reticence was present again during the hearing when Pizzi appeared to testify more timidly about any matter, past or present, in which she would personally implicate Franco in any wrongdoing. See, e.g., Tr. 3:116; 4:31-32.

[16]Having reached this conclusion, the Court need not address the government's alternative arguments about the "exigent circumstances" or "emergency aid" exceptions to the warrant requirement.

The record shows that there was probable cause for the search warrant that the officers later sought and received for Franco's residence at 386A Walnut Street. The search affidavit, submitted by Lieutenant Daniel Fee of the Lynn Police Department, recounted the events of May 3, 2011 including the 911 call by Lyden to the her shared residence with Franco, the officers' observations of Lyden and the state of the residence upon their arrival and Lyden's production of Franco's duffel bag containing a firearm, ammunition, what appeared to be marijuana and a scale and Lyden's statement that Franco had a safe with steroids in them which the officers observed in the residence. Exh. R to Def. Mot.[17] The affidavit recited the police department's knowledge of Franco's affiliation with the Hell's Angels and that this organization was known to be "a criminal enterprise involving narcotics, extortion and other violent crimes." Id. The Fee affidavit sets forth sufficient facts to afford the issuing clerk magistrate a "substantial basis for determining the existence of probable cause" for the search. Gates, 462 U.S. at 238. Accordingly, the Court finds that there was probable cause for the search warrant.[18]

## V. Conclusion

For the foregoing reasons, Franco's motion to suppress the firearm and ammunition seized

---

[17]In Franco's initial filings, he requested a Franks hearing on the ground that the inconsistency between the police accounts of May 3rd and Lyden's and Pizzi's affidavits suggests that the search warrant affidavit contains "deliberate falsehoods, which when removed, eviscerate any probable cause." D. 26 at 22-23. Although Franco did not subsequently press this request, the Court notes that he did not make the "substantial preliminary showing" required for a Franks hearing. Franks, 438 U.S. at 155-56. Moreover, after a full evidentiary hearing concerning the facts underlying the search warrant affidavit, the Court disagrees with Franco's characterization of the affidavit and a Franks hearing was not warranted.

[18]Since the Court finds that the search warrant was supported by probable cause, the application of the good faith exception to the search warrant under United States v. Leon, 468 U.S. 897 (1984) is unnecessary.

from his residence on May 3, 2011 is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge
